UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | CR. NO. 05-10325-NG |
| ) | |
| **RONALD CREWS,** ) | |
| **Defendant.** ) | |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS**
**August 25, 2006**

**I. INTRODUCTION**

Defendant Ronald Crews requests that this Court suppress the fruits of a search conducted by aeronautical inspectors after the crash landing of the plane he had been piloting. Specifically, defendant requests that this Court suppress the contents of a blue lunch bag -- including a hypodermic syringe, two vials containing insulin, and a glucose meter -- found on the plane. Because I find the search to be a valid administrative search, defendant's motion is hereby **DENIED**.

**II. FACTS**

On February 2, 2002, a Cape Air flight piloted by Ronald Crews departed Martha's Vineyard for a short flight to Hyannis. The small plane carried four passengers, including a student pilot. At the time, Crews had been a pilot at Cape Air for nearly four years.

Shortly after takeoff, a loud siren sounded inside the plane and a red light flashed on the instrument panel. Defendant allegedly ignored both warnings. The passengers also noted that the plane had turned towards the northeast, which was unusual for a flight to Hyannis. Although Crews corrected this mistake, he allegedly scared the passengers by engaging in a series of unusual actions, turning the plane left and right, and up and down. He then proceeded to fly past Hyannis.

At this point Melanie Oswalt, the student pilot who was traveling as a passenger aboard the plane, asked defendant where he was going. Defendant replied, "to Hyannis," and pointed straight ahead toward the Atlantic Ocean. Oswalt called Cape Air in Hyannis and informed them that Crews appeared to be lost. Cape Air attempted to contact Crews via radio, but Crews had turned his radio to the wrong frequency.

After Crews failed to right the plane's course, Oswalt moved into the co-pilot's seat and noticed that Crews' eyes appeared to be dazed. Defendant made no response to Oswalt but turned the plane northwards along the edge of Cape Cod, further away from Hyannis. During this turn, the plane began to descend rapidly, causing Oswalt to scream. The plane stopped its descent at a mere 300 feet above ground and Oswalt attempted to take control of the aircraft. Crews became belligerent, but the other passengers managed to restrain Crews' arms so that Oswalt could

conduct an emergency landing of the plane. Oswalt managed to belly-land the plane at Provincetown Municipal Airport ("PMA") and the passengers left the plane unharmed.

State and local police, firefighters, and ambulance operators were the first to arrive on the scene. One of the Provincetown police officers found Crews sitting dazed in his chair and slurring his speech and quickly turned him over to rescue personnel who drove Crews to Cape Cod Hospital.

Accident inspectors from the Massachusetts Aeronautical Commission ("MAC") and Federal Aviation Administration ("FAA") were also called to the scene. MAC Aeronautical Inspector Richard Bunker was one of the individuals summoned. On his way to the scene, Bunker was informed by a police sergeant that Crews was taken to the hospital after having become incapacitated. Bunker was also informed that medical personnel suspected that Crews may have experienced a diabetic episode. After arriving, Bunker led the investigation of the mishap along with FAA safety inspector Ronald Williams. Williams and Bunker jointly inspected the accident scene, examined the aircraft and interviewed the passengers. While the investigators interviewed the passengers, PMA manager Arthur Lisenby cleared all of the baggage and personal belongings out of the plane. Following their interviews with the inspectors, the passengers were permitted to claim their baggage and leave the airport.

The government contends that after the passengers claimed their baggage, two items remained unclaimed: a blue soft-sided lunch bag and a headset container. Defendant contends that Bunker had previously entered the plane and seen these "unclaimed" items in the pilot's area, making it obvious that Crews owned the items. However, the testimony offered at the hearing does not support this theory. Neither Bunker nor Williams admitted to seeing any baggage in the cockpit area, and Lisenby testified that he found the baggage strewn about the cabin.

Around this time Roxanne Oliphant, Crews' girlfriend, called the airport and asked whether Crews' blue lunch bag had been found. She informed at least Lisenby and the person who answered the phone that the blue lunch bag was his.[1] Shortly thereafter, Bunker proceeded to search the blue bag in an alleged attempt to identify its owner. Defendant disputes that this was the purpose of the search. Rather, Crews asserts that the search was actually intended to provide evidence that could confirm Bunker's suspicion that Crews had suffered from a diabetic episode.

---

[1] Lisenby offered different testimony at the hearing, but in an interview given to Investigator McGovern one month after the incident, Lisenby clearly stated that he knew the bag was Crews' before Bunker opened it. Ex. 3. "At some point during this time, Roxy OLIPHANT, CREWS' girlfriend and also a Cape Air employee, called PMA and asked someone at PMA whether anyone had founds CREWS' lunch container. . . . He went back into the baggage area and that was when he noticed that BUNKER has found the insulin and syringe in the container. Although the earlier call from OLIPHANT about CREWS' lunch container had previously struck him as odd, things clicked for him when BUNKER found the syringe and insulin." Id.

Although it is difficult to definitively state whether or not Bunker and Williams knew that Crews owned the bag, the evidence strongly points in this direction. All of the passengers had already collected their baggage before this time and the only remaining items were a headset, headset case, thermos and lunch bag. Realizing that these items were almost certainly Crews' did not require much of an intellectual leap.

After opening the bag, Crews saw a plastic container with a closed lid.[2] Inside were two vials of Humulin, a syringe, hypodermic needles, and a glucose meter. Bunker showed the contents to Williams and reiterated his suspicions that Crews was a diabetic. Williams then called his wife, a pharmacy technician, and described the contents of the container to her. She advised him that what he was describing were two types of insulin that were available for purchase without a prescription. Bunker then photographed the bags and had them held at the PMA so they could later be claimed by their owner. The next day, Crews' girlfriend called the airport again, inquiring about the missing headset and the lunch bag. She was informed that the items were

---

[2] The government contends that the lid was see-through and that Bunker could see the syringe and vials inside. Bunker, the government argues, looked inside the bag either because he expecting to find identifying information on the vials or because he believed the contents might be relevant for Crews' treatment at the hospital. Lisenby's testimony disputes this notion, suggesting that the lid was not transparent and the inspectors needed to pick up the container and peer through the side to see the contents inside. The fact that Bunker and Williams did not first peer into the side of the container in an attempt to find identification seems manifestly clear.

sitting in Lisenby's office and she could come by to pick them up, which she and Crews did later that afternoon.

Crews now moves to suppress the fruits of the allegedly illegal search, including all physical evidence and related subsequent statements.

### III. **ANALYSIS**

Although I disagree with the government's assertion that the search was conducted in an attempt to identify the proper owner of the lunch bag, I believe the search was a valid administrative search.  Therefore, I will deny the motion to suppress.

The Fourth Amendment does not prohibit *all* searches and seizures.  U.S. v. Sharpe, 470 U.S. 675, 682 (1985).  Its mandate covers only those searches and seizures that are unreasonable. Id.  "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" Skinner v. Railroad Labor Executives' Association, 489 U.S. 602, 619 (1989) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). Reasonableness must be determined by balancing the imposition on an individual's Fourth Amendment interests against the importance of the legitimate governmental interest served by the warrantless search.  Id. (citing Delaware v. Prouse, 440 U.S. 648, 654 (1979)).

The Fourth Amendment protection against unreasonable searches and seizures extends to commercial premises as well as private homes. New York v. Burger, 482 U.S. 691, 699 (1987). Thus, an owner possesses a reasonable expectation of privacy in commercial property. Id. (citing Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J. concurring)). This privacy interest not only protects an owner against traditional law enforcement searches by the police, but also against administrative searches. Id. (citing Marshall v. Barlow's, Inc., 436 U.S. 307, 312-13 (1981)). However, an individual's privacy interest in commercial premises is generally reduced and "[t]his expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." Id.

"Because the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search have lessened application in this context." Id. at 702 (citations omitted). The combination of heightened government interests and decreased privacy interests, means that in *certain, limited circumstances* warrantless searches may be reasonable. Id. To determine whether a specific warrantless search falls within this narrow safe harbor, the Court has established a tripartite test. See

id.  See also United States v. Maldonado, 356 F.3d 130, 135 (1st Cir. 2004).  First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." Burger, 482 U.S. at 702.  Second, the warrantless inspections must be necessary to fulfill the regulatory agenda.  Id.  Finally, the certainty and regularity of the inspection program "must provide a constitutionally adequate substitute for a warrant." Id. at 703 (quotations omitted).  "In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." Id.

With respect to the first inquiry, it is plain to this Court that the government has a substantial interest in the regulation of air traffic, generally, and in the investigation of airplane crashes, specifically.  The government correctly notes that this interest includes minimizing the risk and incidence of crashes, be they related to mechanical failure, pilot error or weather, and determining the cause of crashes should they occur.  Def. Mem. at 23.  Diagnosing the problems that caused a crash and using this knowledge to avoid crashes in the future is necessary

to ensure the safety of the millions of individuals who fly on American planes every year.[3]

I also believe that warrantless inspections are necessary to efficaciously conduct post-crash investigations. Although it may have been feasible to obtain a warrant in this particular cases, given the limited number of passengers on the plane and items of luggage remaining on board, "the Burger criteria are applied generally to a statutory scheme, not to a given set of facts arising under that scheme." Maldonado, 356 F.3d at 136. 49 C.F.R. § 831.9 authorizes any employee of the National Transportation Safety Board to "do all things considered necessary for proper investigation," 49 C.F.R. § 831.9(a), including "examin[ing] and test[ing] to the extent necessary any civil or public aircraft . . ., aircraft engine, propeller, appliance, or property aboard such aircraft involved in an accident in air commerce." 49 C.F.R. § 831.9(b). Part of the investigation includes the examination of property aboard an aircraft, particularly property left unclaimed. Requiring search warrants for each individual item searched after an air crash would impose a prohibitive cost on investigations, leading to

---

[3] 49 C.F.R. § 831.4 demonstrates that this is the purpose behind post-crash inspections: "Accident and incident investigations are conducted by the Board to determine the facts, conditions, and circumstances relating to an accident or incident and the probable cause(s) thereof. These results are then used to ascertain measures that would best tend to prevent similar accidents or incidents in the future." Id.

costly delays and making it more difficult to determine the cause of the crash.

The third prong of the <u>Burger</u> test asks whether the owner/operator of the premises is aware of the legality of the search and whether the search's scope is appropriately cabined. These questions can both be answered in the affirmative. The ability of the National Transportation Safety Board to perform searches is established in 49 C.F.R. §§ 830-31. At the hearing, the inspectors testified that they reported to all crashes in the state. Airlines and pilots are surely aware that after an airplane crashes, different federal and state agencies will inspect the crash to determine its cause. The regulations also make clear that this investigation includes the search of property aboard the plane. 49 C.F.R. § 831.9(b). This investigation also has a well-cabined scope: searches do not happen haphazardly or at unpredictable times. They occur after planes crash or, as in this case, when there is a near miss, and they involve an examination of the plane and its contents. A regulatory search could not be much more limited in time, place, and scope.

**IV.  <u>CONCLUSION</u>**

Because I find that the search of Crews' lunch bag subsequent to the Cape Air Crash at Provincetown was a valid

administrative search, I hereby **DENY** defendant's motion to suppress (document #22).

**SO ORDERED.**

**Date:  August 25, 2006**             <u>**/s/NANCY GERTNER, U.S.D.J.**   </u>